**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

---

PUBLIC EMPLOYEES FOR ENVIRONMENTAL
RESPONSIBILITY,
962 Wayne Avenue, Suite 610 Silver Spring, MD
20910 (Montgomery County),

GOVERNMENT ACCOUNTABILITY PROJECT,
1612 K St. NW, Suite 808 Washington DC, 20006,
and

PROJECT ON GOVERNMENT OVERSIGHT,
1100 13th Street NW, Suite 800 Washington, DC
20005,

    *Plaintiffs*,

  v.

OFFICE OF MANAGEMENT AND
BUDGET, 725 17th St., NW
Washington, DC 20503, and

RUSSELL VOUGHT, in his official
capacity as OMB Director, 725 17th St., NW
Washington, DC 20503,

    *Defendants*.

Case No. _____

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Independent oversight of the Executive Branch to protect against waste, fraud, and abuse of taxpayer funds has been under unprecedented attack. Days into his new Administration on January 24, 2025, President Donald J. Trump fired 17 Senate-confirmed inspectors general, including many he had appointed in his first term. After that "Midnight Purge," the President removed the Director of the Office of Government Ethics and the head of the Office of Special Counsel. The Administration has since removed other inspectors general, all without regard to a law requiring 30 days' notice to Congress.

2.      Now, the attack on independent government watchdogs continues as the Office of Management and Budget (OMB) and OMB Director Russell Vought target the agency tasked with supporting and improving the oversight system: the Council of the Inspectors General on Integrity and Efficiency (CIGIE). Defendants are attempting to shutter CIGIE by taking away its Congressionally appropriated funding.

3.      CIGIE was established by Congress in 2008 to coordinate oversight across federal agencies and support the work of over 70 federal Offices of Inspector General (OIGs). OIGs are a vitally important component of good governance, acting as so-called "watchdogs," that root out waste, fraud, and corruption in the federal government. OIGs routinely save taxpayers more than $50 billion every year.

4.      CIGIE acts as a service provider and resource hub for OIGs and interested members of the public. CIGIE maintains oversight.gov: the flagship website supporting the IG system, which provides an online complaint filing tool and serves as a public repository for tens of thousands of reports with IG findings on waste and fraud. CIGIE also maintains ignet.gov, which houses important information about CIGIE's operations and resources for OIGs and the public.

1

CIGIE hosts more than two dozen other IG websites that provide whistleblower links, hotlines, and other public resources. Moreover, CIGIE recommends suitable candidates for vacant IG positions and helps train, equip, and provide investigative expertise to dozens of IGs. CIGIE staff help operate hotlines for tips and provide data analysis and investigative tools to help with probes. CIGIE supports nearly 14,000 federal investigative employees.

5.     CIGIE also provides a critical accountability function for OIGs and the public. CIGIE's Integrity Committee receives, reviews, and refers for investigation allegations of wrongdoing by IGs and other covered persons. The Integrity Committee is one of the only bodies to which people can formally report concerns about inspectors general, and ignet.gov provides the only online submission form specifically for individuals to submit complaints of alleged misconduct by IGs. Without CIGIE, it is not clear who is watching the watchdogs.

6.     For years, CIGIE has dutifully carried out these statutory mandates. OMB has never stood in the way of this process, as it has always complied with its legal duty to make the funds for CIGIE's operations available for CIGIE's use—or "apportion" funds—until now.

7.     OMB and OMB Director Vought have no authority to unilaterally decide to defund a Congressionally created entity, or to provide an entity less than full funding for reasons not based in statute. Yet, they have done exactly that; first by refusing to apportion any funds to CIGIE from October 1 through November 17, 2025, then by apportioning a fraction of its funds for limited purposes until January 30, 2026, while apportioning zero funds for the remainder of fiscal year 2026.

8.     For October and most of November 2025, CIGIE was shuttered, completely unable to operate and fulfill its statutory mandates. The resources CIGIE provides to OIGs, whistleblowers, and the public were taken offline. Its closure was entirely unrelated to the 43-day

government shutdown that began on October 1, 2025. Unlike most parts of the government, CIGIE was never without Congressionally appropriated funds, as CIGIE's funding is without fiscal year limitation and is held in a revolving fund. OMB simply refused to make CIGIE's roughly $28 million in funds available for use.

9.      Although CIGIE informed Congress that OMB "had made a policy decision" to not apportion funds to CIGIE for fiscal year 2026, OMB never issued any formal statement about its refusal. Rather, in response to questions from the press, OMB attacked the integrity of inspectors general writ large, arguing that they are "corrupt, partisan, and in some cases, have lied to the public," and that OMB will not fund such "corruption." By defunding CIGIE, Defendants targeted all OIGs, and defanged the agency tasked with overseeing them.

10.      In mid-November, after Congressional action rescinding and forbidding reductions in force by executive agencies until January 30, 2026, OMB apportioned a limited amount of funds to CIGIE. OMB's apportionment only provides funds through that January 30th date and subjects the availability of those funds to limits imposed by OMB, not Congress.

11.      Plaintiffs in this action are three government accountability organizations that rely on and utilize OIGs and the services CIGIE provides, and whose missions and members are harmed by Defendants' attempts to shutter and constrain CIGIE's operations. This suit seeks declaratory and injunctive relief against Defendants' unlawful effort to shut down CIGIE by only partially apportioning funds through January 30, 2026 (after previously withholding all funds), and failing to apportion funds for the remainder of fiscal year 2026.

## PARTIES

12.      Plaintiff Public Employees for Environmental Responsibility (PEER) is a non-profit, non-partisan organization headquartered in Maryland. PEER provides direct services to

3

environmental and public health professionals, land managers, scientists, enforcement officers, and other civil servants dedicated to upholding environmental laws and values. PEER provides pro bono legal services to current and former public employees who hold government accountable to environmental ethics, compliance with environmental laws, and scientific integrity standards. PEER represents and defends federal whistleblowers, investigates and exposes improper or illegal government actions, and works to improve environmental laws and regulations.

13.    Plaintiff Government Accountability Project (GAP) is an independent, non-partisan, and non-profit organization headquartered in Washington, D.C., that since 1977 has promoted corporate and government accountability by providing legal representation to whistleblowers and sharing their verified disclosures of wrongdoing with oversight agencies, lawmakers, stakeholder groups, and the press to make a difference on issues of public concern. GAP has drafted, spearheaded the campaigns to pass, or helped defend all of the federal whistleblower protection laws that exist today. GAP's mission is to provide a safe, effective voice for employees who use free speech rights to challenge abuses of power that betray the public trust, protecting employees who have blown the whistle on issues, including but not limited to, air safety, banking fraud, immigration detention abuses, nuclear power and weapons dangers, threats to the environment, unsafe food, pharmaceutical dangers, illegal electronic surveillance of U.S. citizens, and politicization of independent agencies.

14.    Plaintiff Project On Government Oversight (POGO) is a non-partisan, non-profit organization based in Washington D.C. Founded in 1981, POGO is an independent watchdog that investigates, exposes, and champions reforms on systemic corruption, abuse of power, and waste. POGO does so by conducting and publishing the results of investigations into potential waste, fraud, abuse, and corruption in the federal government, advocating for additional protections for

whistleblowers and improvements to the IG system, and bolstering Congress's oversight capabilities by using its knowledge and expertise to craft oversight trainings for Congressional staff.

15.    Defendant OMB is a federal agency with responsibility for government-wide financial management policies for executive agencies and numerous financial management functions. *See* 31 U.S.C. §§ 503(a), 504. It is part of the Executive Office of the President, *id.* § 501, and maintains its headquarters in Washington, D.C.

16.    Defendant Russell Vought is Director of the Office of Management and Budget (OMB). He is sued in his official capacity.

## JURISDICTION AND VENUE

17.    This court has subject-matter jurisdiction to adjudicate these claims because this action arises under the Constitution and laws of the United States, 28 U.S.C. § 1331, and because Defendants are a United States agency and official, 28 U.S.C. § 1346(a)(2).

18.    This court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 705, 706, and the court's inherent authority to enjoin federal officials from acting unlawfully.

19.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) because Plaintiff PEER resides in this district.

## FACTUAL AND LEGAL BACKGROUND

### *Inspectors General*

20.    Forty-seven years ago, in the wake of the Watergate scandal, Congress passed the Inspector General Act of 1978 (IG Act), codified at 5 U.S.C. § 401 et. seq. When President Jimmy

Carter signed the bipartisan legislation into law, he described these new IGs as "perhaps the most important new tools in the fight against fraud."[1]

21.     The act laid out three primary purposes for IGs: "1) conduct audits and investigations of programs and operations of their affiliated federal entities; 2) recommend policies that promote the efficiency, economy, and effectiveness of agency programs and operations, as well as preventing and detecting waste, fraud, and abuse; and 3) keep the affiliated entity head and Congress fully and currently informed of fraud and other serious problems, abuses, and deficiencies in such programs and operations, as well as progress in implementing related corrective actions."[2]

22.     Congress has substantially amended the IG Act three times since its enactment, generally to expand the number of statutory IGs and enhance their independence, transparency, and accountability, and has also created so-called special inspectors to provide immediate and targeted reviews of government operations.[3]

23.     Currently, there are over 70 OIGs operating across the federal government. OIGs possess several authorities to carry out their respective missions, such as the ability to independently hire staff, access relevant agency records and information, and report findings and recommendations directly to Congress.[4]

24.     Through their audits, inspections, evaluations, and investigations, OIGs deliver significant improvements to the economy and efficiency of programs governmentwide. Over the

---

[1] CIGIE, Press Release, Federal Inspector General Community Commemorates 45 Years of Independent Oversight (Oct. 16, 2023), https://perma.cc/AKX6-JESG.
[2] Ben Wilhelm, Cong. Rsch. Serv., R45450, *Statutory Inspectors General in the Federal Government: A Primer* (2023), https://perma.cc/BPK9-WQ72.
[3] *Id.*; Dr. Michael Shank & U.S. Congressman Steve Cohen, *Why Inspectors General Are Essential for Good Governance*, Apolitical (Feb. 14, 2025), https://perma.cc/3HVC-H2KK.
[4] *Id.*

last four years alone, OIGs have achieved potential savings of approximately $309 billion taxpayer dollars.[5] This represents an average return of over $21 on every dollar invested in OIGs.[6]

25.    As part of their roles, OIGs investigate whistleblower complaints and disclosures, prevent retaliation, and safeguard against wrongdoing. Not only do they deter corruption, but they also empower whistleblowers. Without them, the system may default to empowering those who perpetrate misconduct and suppress those who challenge it.

26.    Certain OIGs also perform crucial content-specific tasks. As one of many examples, the Environmental Protection Agency (EPA) OIG has a critical role in protecting the EPA's oversight procedures and adherence to scientific integrity. In July 2025, for instance, the EPA OIG released a report—initiated in response to an anonymous OIG hotline complaint—finding that the EPA's inadequate oversight of state lead-based paint programs may not adequately protect public health.[7] The report resulted in multiple corrective actions by the EPA.[8]

27.    As another example, the special inspector general for pandemic recovery spearheaded 42 indictments and 33 arrests and recovered more than $60 million.[9] The special inspector general for Iraq reconstruction, additionally, identified nearly $2 billion in financial benefits, including nearly $645 million in direct savings and more than $192 million in court-ordered recoveries. There are many examples like this, all across the federal government.[10]

28.    In sum, a properly functioning IG system is a critical component of Congress's design and of good governance for the American public and their tax dollars.

---

[5] *See* CIGIE, *Annual Report to the President & Congress* Fiscal Years 2021-2024, https://perma.cc/5VLG-76RZ; https://perma.cc/MVB2-WD6P; https://perma.cc/63G3-ZSH7; https://perma.cc/E8MF-9VAF.
[6] *Id.*
[7] EPA OIG, Evaluation of the EPA's Oversight of Authorized State Lead-Based Paint Programs, Report No. 25-E-0042 (July 16, 2025), https://perma.cc/EA8T-NUJ3.
[8] *Id.*
[9] Shank & Cohen, *supra* note 3.
[10] *Id.*

***CIGIE's Statutory Mission & Composition***

29.     The Council of the Inspectors General on Integrity and Efficiency–or CIGIE–was established as an independent agency by the Inspector General Reform Act of 2008.[11]

30.     Its statutory mission is to "address integrity, economy, and effectiveness issues that transcend individual Government agencies," and to "increase the professionalism and effectiveness of personnel by developing policies, standards, and approaches to aid in the establishment of a well-trained and highly skilled workforce in the Offices of the Inspectors General." 5 U.S.C. § 424(a)(2).

31.     CIGIE's membership consists of over 70 individual IGs from across the Executive and Legislative branches, as well as six specified senior officials from the Office of Management and Budget, Office of Personnel Management, Office of the Special Counsel, Office of Government Ethics, and the Federal Bureau of Investigation. *See* 5 U.S.C. § 424(b)(1).[12]

32.     CIGIE is led by an Executive Chairperson (the Deputy Director for Management of OMB), an elected Chairperson (one of the member IGs), a Vice Chairperson (appointed by the Chairperson), and members of its Executive Council. The Executive Council consists of the Chairperson, the Vice Chairperson, the past Chairperson, an at-large member, and CIGIE Committee Chairpersons. *See* 5 U.S.C. § 424(b)(2), (3).[13]

33.     CIGIE committees include the: Audit Committee; Budget Committee; Inspection and Evaluation Committee; Integrity Committee; Investigations Committee; Legislation Committee; Pandemic Response Accountability Committee (PRAC);[14] Professional Development

---

[11] *See* CIGIE, *Cong. Budget Justification, Fiscal Year 2026* 4 (2025), https://perma.cc/672B-LR97.
[12] *See also* CIGIE, *Cong. Budget Justification* at 4.
[13] *See also id.*
[14] In the 2020 CARES Act, Congress created the Pandemic Response Accountability Committee (PRAC) as a committee of CIGIE. *See* CARES Act, Pub. L. No. 116-136, § 15010, 134 Stat. 281 (2020). The primary purpose of PRAC is to support independent oversight of more than $5 trillion in funds provided by pandemic relief legislation. *See* CIGIE, *Cong. Budget Justification* at 13.

Committee; and Technology Committee.[15] Staff from the individual OIGs support these committees as well as other CIGIE working groups.[16]

34.     Before October 1, 2025, CIGIE had a permanent staff of 34 full-time equivalents (FTEs) to support its work and mission.[17] Upon information and belief, since OMB's actions to withhold CIGIE's funding, several CIGIE staff members have left.

### *CIGIE's Functions & Duties*

35.     To execute CIGIE's mission of developing a well-trained, highly skilled OIG workforce, implementing quality standards and approaches to oversight, conducting and supporting cross-agency oversight work, and promoting accountability in the OIG community, CIGIE carries out numerous functions and duties.[18] These include, among others, (1) promoting accountability in OIGs through an Integrity Committee; (2) operating oversight.gov; (3) recommending qualified IGs and developing a highly-skilled OIG workforce; and (4) maintaining ignet.gov:

### *1. Promoting Accountability in OIGs through an Integrity Committee*

36.     CIGIE is statutorily required to have an Integrity Committee (IC) to "receive, review, and refer for investigation allegations of wrongdoing" made against inspectors general, designated senior members of OIGs, and the Special Counsel and Deputy Special Counsel of the Office of Special Counsel. 5 U.S.C. § 424(d)(1).

37.     The IC refers to these individuals collectively as "Covered Persons."[19]

---

[15] *See id.* at 5; *see also* CIGIE, *Annual Report to the President & Congress, Fiscal Year 2024*, 4 (Mar. 2025), https://perma.cc/AL8Z-GSR5.
[16] CIGIE, *Cong. Budget Justification* at 4.
[17] *Id.*
[18] *See generally* CIGIE, *Cong. Budget Justification, Fiscal Year 2026*; *see also* 5 USC 424(a).
[19] *See* CIGIE, *Designated Positions Under the Authority of the Integrity Committee (Covered Persons)* (Mar. 11, 2025), https://perma.cc/U82C-TLQP.

38.     The IC provides a form on ignet.gov for people to submit allegations of or provide information regarding wrongdoing by an IG or other Covered Person.[20]

39.     While CIGIE was defunded, ignet.gov was offline and, thus, the IC's form was inaccessible. Upon information and belief, when CIGIE's apportioned funds run out after January 30, 2026, ignet.gov and the IC's form will once again be offline.

40.     By statute, no later than 7 days after the IC receives an allegation of wrongdoing against an IG or other Covered Person, the allegation must be reviewed and referred to the IC, the Department of Justice, or the Office of Special Counsel. *See* 5 U.S.C. § 424(d)(5)(A). If referred to the IC, the IC typically has 30 days to determine whether to refer the allegation of wrongdoing to the Chairperson of the IC to initiate an investigation. *See id.* § 424(d)(5)(B).

41.     The Chairperson of the IC is required to "cause a thorough and timely investigation of each allegation" so referred, *see id.* § 424(d)(6)(A), and the IC must typically complete the investigation no later than 150 days after the date on which the IC made the referral, *see id.* § 424(d)(7)(C)(i). The IC conducts its investigations with the voluntary assistance of an OIG.[21] CIGIE maintains a list of OIGs capable of undertaking investigations on behalf of the IC, and CIGIE reimburses the assisting OIG for the costs incurred for the investigation.[22]

42.     Regardless of whether an allegation of wrongdoing is referred to the IC, the Department of Justice, or the Office of Special Counsel, the investigating entity must submit to the IC a report containing the results of the investigation. *See id.* § 424(d)(7)(E)(i), (ii).

43.     The IC must assess such reports, and within 30 days (to the maximum extent practicable) forward the report, with the recommendations of the IC, to the Executive Chairperson

---

[20] *See* CIGIE, *Integrity Committee Form*, IGnet (July 28, 2025), https://www.ignet.gov/ic/form.

[21] *See* CIGIE, *Integrity Committee Policies & Procedures* (Jan. 2018, Rev. 1), https://perma.cc/52C7-G8TV.

[22] *See id.*

of CIGIE and to the President or the head of the applicable federal entity for resolution. *See id.* § 424(d)(8)(A)(i), (ii). The IC also must submit the report, with its recommendation, to the appropriate Congressional committees and interested members. *See id.* § 424(d)(8)(A)(iii), (iv).

44.     The Executive Chairperson of CIGIE must report to the IC and the appropriate Congressional committees the final disposition of the matter, including what action was taken by the President or agency head. *See id.* § 424(d)(8)(B).

45.     CIGIE is required to submit periodic reports to Congress and the President detailing the activities of the IC to address allegations of wrongdoing made against IGs and other Covered Persons during the reporting period. *See id.* § 424(d)(9).

46.     CIGIE's most recently published report (March 2025) states that in Fiscal Year 2024, the IC received 3,471 incoming communications, which resulted in 141 cases. Of those cases, 68 were reportedly closed, 45 were referred to another agency, and 28 remained pending.[23]

### *2. Operating oversight.gov*

47.     CIGIE is also statutorily required to establish and maintain a website entitled "oversight.gov." 5 U.S.C. § 424(e)(2).

48.     By statute, CIGIE must maintain oversight.gov to "consolidate all public reports from each Office of Inspector General to improve the access of the public to any audit report, inspection report, or evaluation report (or portion of any such report) made by an Office of Inspector General," "includ[ing] any additional resources, information, and enhancements as [CIGIE] determines are necessary or desirable." *Id.*

---

[23] *See* CIGIE, *Annual Report to the President & Congress* at 12.

49.     CIGIE launched oversight.gov in October 2017 and uses oversight.gov to track IG vacancies, provide whistleblower resources, and consolidate federal OIG public reports.[24]

50.     Oversight.gov provides centralized access to over 30,000 reports, including audit, inspection, and evaluation reports, OIG semiannual reports, OIG peer reviews, and other OIG publications.[25]

51.     The oversight.gov platform also promotes IG independence by hosting agency OIG websites with hotline and whistleblower links for the public to anonymously report fraud, waste, and abuse.[26] By September 2025, at least 28 OIGs had migrated their public websites to the oversight.gov platform, and more than a dozen additional OIGs had expressed interest in having their websites hosted on the platform.[27]

52.     Oversight.gov has historically facilitated significant public engagement and access: CIGIE reports more than 1 million engagements (visits, report downloads, etc.) annually.[28]

53.     While CIGIE was defunded, oversight.gov was offline and, thus, the website and above resources were inaccessible. While CIGIE was defunded, several of these agency OIG websites and resources were also offline or operating in a limited capacity.[29] Upon information

---

[24] *See* CIGIE, *Annual Report to the President & Congress* at 7; *see also* CIGIE, *Cong. Budget Justification* at 6; Cristin Dorgelo et al., *Trump Administration's Undercutting of Oversight Hurts Taxpayers and Beneficiaries*, Ctr. on Budget & Policy Priorities (Nov. 6, 2025), https://perma.cc/AQX5-45K3.

[25] *See* CIGIE, *Annual Report to the President & Congress* at 7.

[26] Letter from CIGIE to S. Appropriations Comm., House Appropriations Comm., S. Homeland Sec. and Governmental Affs. Comm., and House Oversight and Gov't Reform Comm. (Sept. 27, 2025) https://perma.cc/E4QW-YA5G.

[27] *See* CIGIE, *Annual Report to the President & Congress* at 7; *see also* Letter from CIGIE to S. Appropriations Comm., et al., *supra* note 26, at 2 & n.4 (listing OIGs that have migrated to CIGIE's system).

[28] *See* CIGIE, *Cong. Budget Justification* at 7.

[29] *See e.g.*, DOJ, OIG Website Repository, https://web.archive.org/web/20251001220629/https://oig.justice.gov/ (last visited Oct. 1, 2025); ED, OIG Website Repository, https://web.archive.org/web/20251001220645/https://oig.ed.gov/ (last visited Oct. 1, 2025); DOL, OIG Repository, https://web.archive.org/web/20251007130715/https://oig.dol.gov/ (last visited Oct. 7, 2025); *see also* Justin Doubleday, *Federal websites, IG hotlines start to go dark under shutdown*, Fed. News Network (Oct. 1, 2025), https://perma.cc/3B35-HXWQ (reporting "more than two dozen inspectors general websites and whistleblower hotlines are no longer active after the Trump administration decided to defund a federal IG council").

and belief, without apportioned funding on January 31, oversight.gov and the resources it hosts will once again be inactive.

### 3. Recommending Qualified IGs and Developing a Highly Skilled OIG Workforce

54.    CIGIE is also statutorily required to make recommendations of individuals to serve as inspectors general. 5 U.S.C. § 424(c)(1)(F).

55.    And CIGIE is statutorily required to "maintain 1 or more academies as the Council considers desirable for the professional training of auditors, investigators, inspectors, and other personnel of the various offices of Inspectors General." 5 U.S.C. § 424(c)(1)(E).

56.    CIGIE's Training Institute consists of three academies that focus on criminal investigations; audits, inspections, and evaluations; and leadership competencies.[30] The Training Institute also supports efforts to strengthen OIG staff through a range of professional development programs, including coaching and mentoring, job rotations and shadowing, and traditional learning.[31]

57.    In Fiscal Year 2024, the Training Institute enrolled more than 10,600 students in classes and events.[32] Prior to October 1, 2025, fourteen of CIGIE's 34 FTEs supported training efforts.[33]

58.    While CIGIE was defunded, CIGIE's Training Institute did not operate.

### 4. Maintaining ignet.gov

59.    CIGIE also administers ignet.gov, which is the public hub for CIGIE's activities. It houses, for example, information, guidance, and links to facilitate and submit complaints for

---

[30] *See* CIGIE, *Cong. Budget Justification* at 12.
[31] *Id.*
[32] *Id.*
[33] *Id.* at 4.

potential fraud, waste, abuse, or misconduct to both OIGs throughout the government, and, when appropriate, the Integrity Committee.

60.    The ignet.gov website also houses a vast library of reports, resources, and data aggregated and generated by CIGIE in the course of its work. This includes documents relating to: CIGIE's Legislation Committee and its legislative priorities, initiatives, and actions;[34] the IGs that serve on CIGIE and the composition of its staff;[35] the Integrity Committee's composition, operations, policies, periodic reports, and reports of investigation;[36] voluminous manuals, guides, and assessment and quality assurance guidelines relating to the IC and initiatives and compliance across the IG community;[37] CIGIE's Freedom of Information Act (FOIA) reading room, containing records regarding CIGIE and the IG community's management and investigative statistics and other important operational documents;[38] quality standards established by CIGIE for OIGs to apply in the course of their work on digital forensics, investigations, inspections and evaluations, and general operations;[39] schedules, guides, and checklists for OIG peer reviews of their significant functions;[40] and reports on the top management and performance challenges facing multiple federal agencies that discuss key areas of concern facing the IG community.[41]

---

[34] *See* CIGIE, *Legislation*, https://www.ignet.gov/content/legislation-0 (last visited Dec. 15, 2025).

[35] *See* CIGIE, *Leadership and Staff*, https://www.ignet.gov/content/leadership-and-staff (last visited Dec. 15, 2025); *id.*, *CIGIE Organizational Chart*, https://www.ignet.gov/content/cigie-organizational-chart (last visited Dec. 15, 2025).

[36] *See* CIGIE, *Integrity Committee*, https://www.ignet.gov/cigie/committees/integrity-committee (last visited Dec. 15, 2025); CIGIE, *Integrity Committee Reports*, https://www.ignet.gov/content/integrity-committee-reports (last visited Dec. 15, 2025).

[37] *See* CIGIE, *Quality Standards*, https://www.ignet.gov/content/quality-standards (last visited Dec. 15, 2025).

[38] *See* CIGIE, *FOIA Reading Room*, https://www.ignet.gov/content/foia-reading-room-1 (last visited Dec. 15, 2025).

[39] *See* CIGIE, *Quality Standards*, https://www.ignet.gov/content/quality-standards (last visited Dec. 15, 2025).

[40] *See* CIGIE, *IG Peer Reviews*, https://www.ignet.gov/content/ig-peer-reviews (last visited Dec. 15, 2025).

[41] *See* CIGIE, *Top Management and Performance Challenges Facing Multiple Federal Agencies*, https://www.ignet.gov/content/top-challenges (last visited Dec. 15, 2025).

*CIGIE's Funding*

61.     Pursuant to its enabling legislation, CIGIE has established a revolving fund called the "Inspectors General Council Fund." 5 U.S.C. § 424(c)(3)(B)(i)(I). A "revolving fund" is "a form of permanent appropriation."[42]

62.     In that Act, Congress also authorized CIGIE to engage in interagency funding, to require CIGIE members to fund or participate in the funding of CIGIE's activities, and to deposit amounts received, or amounts remaining from other purposes, in the Inspectors General Council Fund. 5 U.S.C. § 424(c)(3).

63.     Amounts deposited in the Inspectors General Council Fund remain available to CIGIE without fiscal year limitation, and thus are "no-year funds" that do not expire at the end of the fiscal year. 5 U.S.C. § 424(c)(3)(B)(iv). CIGIE may use these funds to carry out its functions and duties, including to provide training to OIGs. 5 U.S.C. § 424(c)(3)(B)(iii).

64.     Although amounts in the fund also include fees and tuition payments from CIGIE's Training Institute and certain amounts appropriated to CIGIE in annual appropriations acts,[43] CIGIE receives most of its funding from pro rata assessments from member OIGs. 5 U.S.C. §§ 424(c)(3)(A)(i)(I), (B)(ii); *see also* 5 U.S.C. § 424(c)(3)(A)(ii) (providing that, on the Executive

---

[42] GAO, GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget Process* 88 (Sept. 2005), https://www.gao.gov/assets/gao-05-734sp.pdf.

[43] Starting in fiscal year 2019, Congress began appropriating no-year funds to CIGIE for enhancements to oversight.gov. Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 633, 133 Stat 13 (2019). Congress has continued to appropriate no-year amounts for oversight.gov in annual appropriations acts. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 629, 138 Stat. 460 (2024); *see also* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101, 139 Stat. 9 (2025); Continuing Appropriations, Agriculture, Legislative Branch, Military Construction and Veterans Affairs, and Extensions Act, 2026, Pub. L. No. 119-37, div. A, § 101, 139. Stat. 495, 496 (2025). CIGIE also has received no-year funding "to further enhance the data analytics capabilities of the [PRAC] to enhance transparency and to prevent, detect, and remediate waste, fraud, and abuse in federal spending." *See* Pub. L. No. 118-47, § 629; Pub. L. No. 119-4, § 1101; Pub L. No. 119-37, § 101.

Chairperson's authorization, CIGIE members "shall fund or participate in the funding" of CIGIE's activities).

65. Each fiscal year the Chairperson, in consultation with the Executive Council, determines and presents to CIGIE members an assessment amount for each OIG member. The amount is prorated based on the member's appropriation or funding level, and is intended to cover CIGIE's anticipated annual costs.[44]

66. Member OIGs include this amount in their Congressional budget justifications.[45]

67. Once Congress appropriates funding to the OIGs, CIGIE collects the assessment amount from each member OIG. Those amounts fund CIGIE's operations for the following fiscal year.

68. This unique advance funding structure effectively insulates CIGIE from lapses in appropriations. First, because amounts transferred to the revolving fund are available without fiscal year limitation, they do not expire. Second, because the amounts inspectors general transfer to CIGIE fund its operations for the following fiscal year, CIGIE may continue its critical oversight work and support for OIGs without any imminent threat of a shutdown.

69. In total, as of October 1, 2025, the Inspectors General Council Fund contained at least $27 million in unobligated no-year funds.

### OMB Must Apportion Funds for CIGIE's Operations without Improper Political or Policy Considerations

70. Under the Anti-Deficiency Act, OMB (acting pursuant to a delegation from the President) must "apportion"—meaning to make available for obligation or expenditure—

---

[44] CIGIE, *Charter* (amended Dec. 18, 2018), https://www.ignet.gov/sites/default/files/files/CIGIE_Charter_12-18-2018.pdf.

[45] *See* CIGIE, *Cong. Budget Justification, Fiscal Year 2026* at 8. *See also, e.g.*, DOJ OIG, *FY26 Cong. Budget Justification*, https://perma.cc/F2RM-5DAQ; DHS OIG, *FY26 Cong. Budget Justification*, https://perma.cc/FZ6L-YTX3; Treasury OIG, *FY26 Cong. Budget Justification*, https://perma.cc/6VUH-75R2.

Congressionally appropriated funds to the relevant executive agency. 31 U.S.C. § 1513(b); Exec. Order No. 6,166 (June 10, 1933), as amended by Exec. Order No. 12,608, 52 Fed. Reg. 34617 (Sept. 9, 1987). Apportionments are legally binding on executive agencies.[46]

71.     Congress established the apportionment process to prevent agencies from spending appropriations too quickly, so that they would not run out of money during the fiscal year and need to request a "supplemental appropriation" from Congress. 31 U.S.C. § 1512(a). Congress also required that no-year funds "be apportioned to achieve the most effective and economical use." *Id.*

72.     An agency official who authorizes an obligation or expenditure that exceeds an apportionment "shall be subject to appropriate administrative discipline" and may be subject to criminal penalties. 31 U.S.C. §§ 1517–19.

73.     As relevant here, OMB "shall apportion in writing an appropriation available to an executive agency," and "shall notify the head of the executive agency of the action taken in apportioning the appropriation" not later than "20 days before the beginning of the fiscal year for which the appropriation is available." 31 U.S.C. §§ 1513(b)(1), (2)(A); *see also* OMB, Circular No. A-11: Preparation, Submission, and Execution of the Budget § 10.5 (Aug. 2025) (stating that "OMB apportions funds made available in the annual appropriations process and other available funds" by September 10).

74.     The Anti-Deficiency Act provides that OMB may use an apportionment to establish a "reserve" only "(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided

---

[46] OMB, Circular No. A-11: Preparation, Submission, and Execution of the Budget §§ 120.1, 120.34 (Aug. 2025) (describing apportionments as "legally binding"); *Citizens for Resp. & Ethics in Washington v. Off. of Mgmt. & Budget*, 791 F. Supp. 3d 29, 55 (D.D.C. 2025).

by law." 31 U.S.C. § 1512(c)(1). The President must report any reserve to Congress under the Impoundment Control Act of 1974 (ICA). 31 U.S.C. § 1512(c)(2).

75.    Prior to 1974, the Anti-Deficiency Act also allowed the President to establish a reserve for "other developments." Pub. L. No. 81-759, ch. 896, 64 Stat. 595, 765 (1950). But when Congress passed the ICA, it also eliminated this "other developments" provision in the Anti-Deficiency Act to "preclude the President from invoking the Act as authority for implementing 'policy' impoundments." *City of New Haven v. United States*, 809 F.2d 900, 906 n.18 (D.C. Cir. 1987).

76.    Upon information and belief, each fiscal year since CIGIE was created, OMB has apportioned CIGIE's yearly funding at the start of the fiscal year.

77.    Records, starting in fiscal year 2022, confirm that before this fiscal year OMB had customarily apportioned at least $18 million to the Inspectors General Council Fund at the start of the fiscal year.[47] The public has access to OMB apportionments from fiscal year 2022 until the present because, in 2022, Congress enacted laws requiring OMB to post its apportionments online, to provide transparency in light of OMB's manipulation of the apportionment process to impound funds.[48]

### *Defendants Withhold CIGIE Funding*

78.    On September 26, only four days before the start of Fiscal Year 2026, OMB personnel notified CIGIE staff that OMB had made a "policy decision that CIGIE would not receive an apportionment of funding" for the fiscal year.[49]

---

[47] Open OMB, *Inspectors General Council Fund Account*, https://perma.cc/R9NZ-NC6X (last visited Dec. 16, 2025).
[48] Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. E, tit. II, §§ 204(b)-(c), 136 Stat. 49, 256-57 (2022) (codified at 31 U.S.C. § 1513 note); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022) (codified at 31 U.S.C. § 1513 note).
[49] Letter from CIGIE to S. Appropriations Comm., et al., *supra* note 26.

79.     Because the Anti-Deficiency Act prohibits an agency from obligating or expending more than OMB has apportioned, as a result of OMB's decision not to apportion funds to CIGIE for fiscal year 2026, CIGIE needed to cease all operations on October 1, 2025. This included furloughing its employees, stopping Integrity Committee operations, and shutting down its website operations, resulting in oversight.gov and ignet.gov going offline.

80.     Members of Congress from both sides of the aisle responded to this news by issuing letters requesting an explanation and further information from OMB.[50] Senators Chuck Grassley and Susan Collins, as leading proponents of the Inspector General Reform Act of 2008, were particularly active in defending CIGIE and PRAC (which OMB had threatened to also defund).[51]

81.     While the administration did not publicly provide specific information about OMB's refusal to apportion funds, a spokesman for OMB told CBS News in a statement that: "Inspectors general are meant to be impartial watchdogs identifying waste and corruption on behalf of the American people[.] Unfortunately, they have become corrupt, partisan, and in some cases, have lied to the public. The American people will no longer be funding this corruption."[52]

82.     On November 12, 2025, continuing resolution H.R. 5371 became law. In addition to funding the government, the continuing resolution nullified a number of personnel actions taken

---

[50] *See* Letter from Susan Collins, Chair, U.S. Senate Comm. on Appropriations & Charles Grassley, Chairman, U.S. Senate Comm. on the Judiciary, to Russell Vought, Director, Off. of Mgmt. & Budget (Sept. 29, 2025), https://perma.cc/S3ML-FA5B; Letter from James Walkinshaw, Member of Congress, to Russell Vought, Director, Off. of Mgmt. & Budget (Sept. 30, 2025), https://perma.cc/CHP5-SPT4; Letter from Robert Garcia, Ranking Member, H. Comm. on Oversight & Gov't Reform & Jamie Raskin, Ranking Member, H. Comm. on the Judiciary, to Russell Vought, Director, Off. of Mgmt. & Budget (Oct. 10, 2025), https://perma.cc/6FDK-SQLN.
[51] Chuck Grassley, *OMB Releases Nearly $4.3 Million For CIGIE Following Push By Grassley, Collins* (Nov. 18, 2025), https://perma.cc/JXB6-7ES2. Although PRAC was scheduled to sunset on September 30, 2025, in July of this year Congress extended PRAC's authorization until 2034, expanded its jurisdiction, and appropriated $88 million in additional funding. *See* 2025 Budget Reconciliation Act, Pub. L. 119-21, 139 Stat. 72 (2025). On September 30, 2025, OMB apportioned $5 million to PRAC to fund its operations through the first quarter of Fiscal Year 2026. *See* U.S. Senator Susan Collins, *OMB Releases $5 Million for PRAC Following Push by Senators Collins, Grassley*, Collins Senate Office (Oct. 1, 2025), https://perma.cc/SL6T-2774.
[52] Scott MacFarlane, *Trump Administration to Defund Federal Watchdog Council*, CBS News (Oct. 1, 2025), https://perma.cc/M2XH-EVUE.

by the administration and placed substantive limits on the administration's ability to take further similar actions. Specifically, Congress stated: 1) that "any reduction in force proposed, noticed, initiated, executed, implemented, or otherwise taken by an Executive Agency between October 1, 2025, and the date of enactment, shall have no force or effect," *id*., Section 120(e); and 2) that "during the period between the date of enactment of this Act and [January 30, 2026], no federal funds may be used to initiate, carry out, implement, or otherwise notice a reduction in force to reduce the number of employees within any department, agency, or office of the Federal Government," *id*., Section 120(a).

83.     On November 18, OMB apportioned $4,287,000 to CIGIE's Inspectors General Council Fund. In a legally binding footnote, OMB restricted the use of those funds to "salaries and expenses or to make payments otherwise required by law through January 30, 2026."[53] Upon information and belief, when OMB restored funding, CIGIE staff were recalled from furlough.

84.     While the availability of CIGIE's no-year funding was not related to or contingent upon the passage of the CR, OMB apportioned funds for CIGIE's "salaries and expenses" until January 30, 2026: the same timeframe for which Congress has prohibited the executive branch from carrying out reductions in force. This indicates that OMB may have viewed the CR as requiring them to apportion sufficient funding to retain CIGIE's staff during this time period.

85.     OMB did not apportion any of the roughly $24 million in remaining no-year funds otherwise available to CIGIE for the rest of the fiscal year. Thus, under the current apportionment, CIGIE will no longer have funding on January 31, 2026. This impending lack of funding reflects OMB's new policy that CIGIE would not receive an apportionment of funding for fiscal year 2026.

---

[53] OpenOMB, *Inspectors General Council Fund, TAFS: 542-4592/X-Inspectors General Council Fund*, https://openomb.org/file/11483369 (last visited Dec. 6, 2025). An apportionment footnote provides that the Inspectors General Council Fund "is also receiving funds pursuant to H.R. 5371 [the CR] as automatically apportioned via OMB Bulletin 26-01." *Id.*

86.     On the day OMB partially apportioned CIGIE's funding, Senator Grassley also reported that OMB is conducting a programmatic review of CIGIE's activities.[54]

### *Defendants' Actions Degrade CIGIE's Ability to Fulfill its Mission*

87.     Between October 1 and January 30 in fiscal years 2022, 2023, 2024, and 2025, CIGIE had access to over $18 million in apportioned funding. The amount apportioned to CIGIE for this same time period in fiscal year 2026 is approximately 30% less than what CIGIE would otherwise have, based on historical rates, over that time period if those funds were divided evenly.

88.     Upon information and belief, as a result, CIGIE's ability to perform its statutory obligations has and continues to be materially harmed.

89.     For example, upon information and belief, while CIGIE's Training Institute is now operating, it is currently unable to provide the level of programming it has in the past.

90.     Upon information and belief, the Integrity Committee, while operating, is currently limited in the number of complaints it is able to address and the number of investigations it is able to initiate.

91.     Additionally, unlike every other year of its existence, CIGIE currently lacks funding for the remainder of the fiscal year. Upon information and belief, OMB's decision to not apportion funds beyond January 30 makes future planning difficult, if not impossible.

92.     Indeed, this funding uncertainty is especially difficult given how CIGIE operates. CIGIE's operations depend on the revolving nature of its funding. CIGIE collects assessments from OIGs for the next year's activities and training programs. CIGIE uses those funds to pay upfront costs, and then CIGIE recovers those amounts by collecting IG assessments over the course of the year. Without access to the millions of its no-year funds in the revolving fund, CIGIE cannot

---

[54] Grassley, *supra* note 50.

conduct its normal operations in support of its statutory mission, stunting its ability to plan and make obligations and adding unnecessary inefficiencies.

93.     When CIGIE's apportioned funds run out after January 30, 2026, CIGIE will be further, and once again wholly, prevented from performing its statutory obligations. As a result, the Training Institute will end all operations; oversight.gov and the dozens of IG websites that depend on CIGIE will go offline; and the Integrity Committee will completely cease to investigate and address whistleblower and retaliation complaints made against IGs and other Covered Persons.

### *Other Actions Weakening the Inspector General System and Government Oversight*

94.     Since January 2025, the administration has fired 19 Senate-confirmed Inspectors General (IG). Those removals did not follow the lawful process outlined for such removal. *See* 5 U.S.C. § 403(b). The terminations, along with other IG departures, have left 29 IG offices without Senate-confirmed leadership. While the administration has recently nominated a handful of new IGs, their impartiality is the subject of serious inquiry by Congressional leaders.[55]

95.     OIGs have been subject to large staffing reductions, and the President's fiscal year 2026 budget request proposed cuts of as much as 30 percent from IG operating budgets.

96.     In February 2025, the Administration removed the Director of the Office of Government Ethics and the head of the Office of Special Counsel, agencies that lead and oversee the executive branch ethics program and safeguard the merit system and whistleblowers, respectively, are CIGIE members, and serve important roles related to the Integrity Committee.

97.     OMB has also publicly directed agencies not to cooperate with the Government Accountability Office, which is Congress's watchdog.

---

[55] *See* Sean Michael Newhouse, *Whistleblower Organizations applaud withdrawal of Trump's 'unfit' nominee to lead oversight office*, Gov. Exec. (Oct. 22, 2025), https://perma.cc/6F2B-Y6GD.

98.     These actions have a potential chilling effect on whistleblower activities and on the willingness of IGs to perform their statutory duties, investigate whistleblower disclosures, prevent retaliation, and safeguard against wrongdoing. Not only do IGs deter corruption, but they also empower whistleblowers. Without professional, well-trained, independent IGs, the system will empower bad actors who can silence anyone seeking to stand up against abuses of power.

### *Plaintiffs are Harmed by OMB's Failure to Fund CIGIE*

99.     Plaintiffs Public Employees for Environmental Responsibility (PEER), Government Accountability Project (GAP), and Project On Government Oversight (POGO) are each dedicated to promoting transparency, accountability, and ethical conduct within government and public institutions, while protecting those who expose wrongdoing through whistleblowing.

100.    Plaintiffs bring serious problems in the federal government and the private sector to light by, among other things, providing assistance and counseling in exposing wrongdoing, investigative research, and public campaigns to remedy identified problems. Plaintiffs PEER and GAP also provide legal representation to whistleblowers.[56]

101.    Defendants' failure to fully apportion appropriated funds to CIGIE is presently frustrating Plaintiffs' access to avenues of redress and information they use in their routine information-dispensing, counseling, and referral activities.

102.    Moreover, when CIGIE's apportioned funds run out after January 30, 2026, CIGIE's ability to fulfill its statutory obligations will cease. The resources that CIGIE provides will be unavailable, including oversight.gov, ignet.gov, and dozens of OIG websites, and the IG hotlines that CIGIE hosts will be inactive. CIGIE's Integrity Committee and Training Institute will be shuttered.

---

[56] *See* PEER, GAP, & POGO, *Caught Between Conscience and Career* 13 (2021), https://peer.org/wp-content/uploads/2021/02/Caught_Between_Conscience_and_Career.pdf.

103.    CIGIE's closure will further frustrate Plaintiffs' access to avenues of redress and information they use in their routine information-dispensing, counseling, and referral activities.

104.    Plaintiffs are expending, and will expend, resources to counter these injuries.

**PEER**

105.    PEER achieves its mission of protecting public employees who protect our environment, natural resources, and public health, in part, by "work[ing] with current and former government employees, usually anonymously, to address issues through official channels," such as by filing complaints with IGs or assisting whistleblowers to file complaints with IGs.[57]

106.    Over the past five years, PEER has filed 12 IG complaints and assisted 4 individuals in filing their own IG complaints. PEER estimates it spent over 1,000 hours on IG complaints and interactions over the past five years.

107.    PEER has at times submitted its own complaints through IG hotlines. PEER has also referred numerous individuals to IG hotlines over this period.

108.    When Defendants refused to apportion any funds to CIGIE from October 1 through November 17, 2025, CIGIE-hosted IG hotlines were inactive. When CIGIE's apportioned funds run out after January 30, 2026, these CIGIE-hosted hotlines—an avenue of redress that PEER has historically relied upon CIGIE to provide—will once again be inactive.

109.    Moreover, recent events have shown PEER that federal employees who raise concerns have reason to doubt the confidentiality and integrity of IGs.[58]

110.    For example, during the first Trump Administration, PEER represented scientists at the EPA who protested "watering down risk assessments for new chemicals being approved for

---

[57] PEER, *How We Work*, https://peer.org/about-us/how-we-work/ (last visited Dec. 12, 2025).
[58] *See* PEER, *COMMENTARY | Trump and the IGs – From Watchdogs to Lapdogs* (Mar. 25, 2025), https://peer.org/commentary-trump-and-the-igs-from-watchdogs-to-lapdogs/.

commercial release."[59] In September 2024, EPA's OIG—then headed by IG Sean O'Donnell—released a series of reports that found, among other things, whistleblower retaliation against three of PEER's clients during the first Trump Administration.[60] On January 24, 2025, EPA IG O'Donnell was one of the 17 IGs dismissed by President Trump.[61]

111.    Since January 2025, PEER has observed a reluctance among OIGs to open probes into subjects involving President Trump's political allies, such as fossil fuel interests or industrial-scale irrigators.[62]

112.    For these reasons, at present, PEER is extremely reticent to advise clients to file IG complaints.

113.    In the past, PEER has sought assistance from CIGIE to restore the integrity of specific OIGs.[63]

114.    But, upon information and belief, Defendants' failure to fully apportion appropriated funds to CIGIE has and continues to materially harm CIGIE's ability to provide independent oversight of IGs, as CIGIE's IC is currently limited in the number of complaints it is able to address and the number of investigations it is able to initiate. When CIGIE's apportioned funds run out after January 30, 2026, CIGIE's capacity and ability will be eliminated entirely.

---

[59] *See* PEER, *EPA Scientists Punished for Identifying Chemical Risks* (Sept. 18, 2024), https://peer.org/epa-scientists-punished-for-identifying-chemical-risks/.
[60] *Id.*
[61] *See* Charlie Savage & Hannah Rabinowitz, *Trump Fires Independent Inspectors General in Friday-Night Purge*, Politico (Jan. 25, 2025), https://perma.cc/25M4-P355.
[62] *Supra*, PEER, *Trump and the IGs – From Watchdogs to Lapdogs*.
[63] *See, e.g.*, PEER, Complaint to CIGIE (Dec. 9, 2009), https://peer.org/wp-content/uploads/attachments/09_9_12_PEER_complaint_to_CIGIE.pdf; *see also* Katz, Marshall & Banks, LLP, Letter to CIGIE (Nov. 1, 2011), https://perma.cc/UMS9-NT8R (counsel sent request to CIGIE on behalf of PEER, GAP, and POGO, and other clients).

115.    In the absence of independent IGs or the independent OIG oversight that CIGIE provides, at present, PEER and its clients are largely unwilling to proceed through official channels for whistleblowing.

116.    Defendants' actions are, thus, frustrating PEER's daily counseling and referral activities. PEER is expending resources to counter these injuries.

117.    Because PEER does not presently feel comfortable advising clients to go to OIGs, when presented with ethical issues, PEER must spend more staff time and resources counseling clients on the new and enhanced risks of filing official whistleblower complaints.

118.    In the absence of support, protection, or redress from OIGs, PEER's clients are increasingly weighing whether to leave their jobs over ethical issues. Such decisions are of extreme personal consequence to PEER's clients and require extensive counseling by PEER.

119.    At the same time that individual client counseling is becoming more time intensive, PEER's workload is increasing significantly. In this year-to-date, PEER has received over 300 intakes—a significant increase from the 20 to 40 intakes PEER received in previous years. PEER attributes this increase in intake in part to the deteriorating trust in IGs.

120.    Additionally, as the integrity of OIGs has deteriorated unchecked, PEER has experienced an increase in meritless, retaliatory, and politically-motivated OIG investigations against its clients. PEER is currently considering filing a complaint with CIGIE's IC concerning a particular retaliatory OIG investigation; however, as stated above, upon information and belief, Defendants' failure to fully apportion appropriated funds is currently materially harming the IC's capacity to investigate and resolve complaints.

121.    PEER expects the diversion of staff time and resources described above to only accelerate when CIGIE's apportioned funds run out after January 30, 2026, and all of CIGIE's operations cease entirely.

**GAP**

122.    GAP achieves its mission of promoting government and corporate accountability, in part, by offering legal and advocacy representation to whistleblowers who seek assistance in safely and effectively disclosing illegality, gross mismanagement, gross waste of funds, abuse of authority, and dangers to public health. Assistance can include assisting whistleblowers in filing complaints with IGs.[64]

123.    Over the past five years, GAP has represented over 200 individuals in filing IG complaints. GAP estimates it spent well over 1,000 hours on IG complaints and interactions over this period.

124.    GAP generally receives more requests for whistleblower representation than it can accommodate. GAP has historically informed many federal employees, federal contractors, and grantees that it cannot service about the availability of OIG hotlines and websites as sources to receive complaints about wrongdoing.

125.    When Defendants refused to apportion any funds to CIGIE from October 1 through November 17, 2025, GAP was aware that CIGIE-hosted hotlines were inactive, which impacted GAP's counseling and referral work and strategy by denying an avenue of redress that GAP has historically relied upon CIGIE to provide. When CIGIE's apportioned funds run out after January 30, 2026, these CIGIE-hosted hotlines will once again be inactive.

---

[64] *See* GAP, *How to Request Assistance*, https://whistleblower.org/how-to-request-assistance/ (last visited Nov. 16, 2025).

126.    Moreover, recent events–particularly the firing of 19 Senate-confirmed inspectors general since January 20, 2025–have made it increasingly difficult for GAP and its clients to rely on certain IGs for an independent investigation. Given the inherent chilling effect of these firings on remaining IGs, at present, GAP recommends caution when filing IG complaints.

127.    Since January 2025, GAP has observed that oversight at certain agencies "has been deliberately decimated to make sure that sand is not put in the gears of executive branch priorities."[65]

128.    Accordingly, even when referring individuals to IG hotlines, at present, GAP has been advising that IGs are becoming increasingly politicized, such that filing complaints through the hotlines and websites carries new and enhanced risks.

129.    In the past, GAP has been involved in requests asking CIGIE to take action to restore the integrity of specific OIGs.[66]

130.    But, upon information and belief, Defendants' failure to fully apportion appropriated funds to CIGIE has and continues to materially harm CIGIE's capacity to provide independent oversight of OIGs, as CIGIE's IC is currently limited in the number of complaints it is able to address and the number of investigations it is able to initiate. When CIGIE's apportioned funds run out after January 30, 2026, CIGIE's capacity and ability will be eliminated entirely.

131.    In the absence of independent IGs or the independent oversight that CIGIE provides, at present, GAP and its clients increasingly believe that they will not get a "fair shake" from IGs and are increasingly relying on Congress as an alternative mechanism for whistleblowing. The Congressional process is longer, less predictable, and does not involve the

---

[65] *See* José Olivares, *Gutting of key U.S. watchdog could pave way for grave immigration abuses, experts warn*, The Guardian (Nov. 30, 2025), https://perma.cc/ZL7G-XBTY (quoting GAP representative).
[66] *Supra*, Katz, Marshall & Banks, LLP, Letter to CIGIE (filed on behalf of GAP, and others, by counsel).

kind of fact-finding provided by the IG process—all of which limits GAP's ability to pursue its accountability mission.

132.    Defendants' failure to fully apportion appropriated funds to CIGIE is, therefore, frustrating GAP's daily counseling and referral activities. GAP is expending resources to counter these injuries.

133.    In this year-to-date, GAP has received over 1,130 intakes—an 81% increase from the 624 intakes GAP received in the previous year. Of the submissions GAP has pursued, GAP has observed a significant increase in concern among submitters about the reliability and confidentiality of IGs.

134.    To account for the near doubling of intakes in 2025, GAP has recently hired four full-time staff members. GAP is also expending more staff time and resources coordinating with volunteers and co-counsel to ensure coverage of GAP's larger workload. Finally, GAP is expending more staff time and resources working with external counsel to assess the legal risks of whistleblowing in particular cases.

135.    GAP expects the diversion of staff time and resources described above to only accelerate when CIGIE's apportioned funds run out after January 30, 2026, and all of CIGIE's operations cease entirely.

### POGO

136.    POGO works to ensure that the federal government "is effective and accountable— governed by just laws, operating with integrity, and committed to serving the public."[67]

137.    POGO investigates potential fraud, corruption, and the abuse of power in the federal government using publicly available information and information gleaned from non-public

---

[67] POGO, *Mission and Values*, https://www.pogo.org/mission-and-values (last visited Dec. 16, 2025).

sources, including whistleblowers and former government employees.[68] POGO publishes its findings to inform the public of government conduct and identify areas of concern for the attention of IGs, Congress, and executive branch agencies.[69]

138.    POGO also uses that information to craft and advocate for policy reforms[70] and to develop oversight trainings that it provides to Congressional staff to improve and assist Congress's oversight capabilities.[71]

139.    POGO also advocates for additional protections for whistleblowers and improvements to the IG system throughout the federal government.[72]

140.    POGO's work relating to CIGIE's IC is extensive. POGO has for years dedicated substantial resources to examining issues and challenges in policing misconduct within IG offices, resulting in legislative and administrative reforms that strengthen the IC.

141.    POGO's work depends on unfettered access to information about how the IG community is functioning so that POGO can ascertain its effectiveness, areas for improvement, and what protections or changes in law, policy, or oversight are necessary to ensure that OIGs are able to carry on their work effectively.

142.    POGO relies on CIGIE as a primary source for that information, including reliance on CIGIE's work tracking, investigating, and improving the work of the IG community, and on the websites CIGIE hosts, namely oversight.gov, ignet.gov, and 28 OIG websites.

143.    POGO's reliance on the resources on ignet.gov includes reliance on:

     a.   the IC's reports and resources, to assess the efficacy of its operations and investigations, report on and publicize concerns about possible conflicts of interest,

---

[68] *See id.*
[69] *See id.*
[70] *See id.*
[71] *See* POGO, *Holding the Government Accountable*, https://www.pogo.org/issue/holding-the-government-accountable (last visited Dec. 16, 2025).
[72] *Id.*

and       make       recommendations       to       improve       it;

b.  the FOIA reading room, to report and publicize instances of corruption, abuse of power, and wasteful spending and to craft and advocate for reforms;

c.  the Legislation Committee's outputs, to inform both POGO's reporting on CIGIE's priorities and POGO's priorities for reforming the IG community;

d.  CIGIE's information about its composition and structure, to understand the crucial relationships and dynamics among CIGIE and the wider IG community;

e.  CIGIE's quality standards for IG conduct, manuals, guides, and assessment and quality assurance guidelines, to assess the conduct and work product of OIGs and understand the standards to which IGs are held;[73]

f.  CIGIE's materials on peer reviews in the IG community, to analyze specific OIGs and understand how they are viewed by their peers, assess tips regarding potential OIG misconduct, and understand the nature of internal accountability within the IG community; and

g.  CIGIE's *Top Management and Performance Challenges Facing Multiple Federal Agencies* reports, to identify thematic issues of waste, fraud, and abuse so that POGO can effectively allocate its resources to important issues.

144.   POGO also extensively relies on the wide range of IG reports and information housed on oversight.gov, which informs virtually every aspect of POGO's mission to promote an effective and accountable government through the IG community.[74]

145.   POGO similarly relies on individual OIG websites that are hosted by CIGIE on behalf of agencies and that often house materials unavailable on oversight.gov itself, including the websites of the OIGs of the Department of Justice, Environmental Protection Agency, Office of Personnel Management, National Archives and Records Administration, Department of Veterans Affairs, and Treasury Inspector General for Tax Administration.

---

[73] POGO recently published a resource for members of Congress and their staff on "Assessing Inspector General Nominations," which drew from *The Quality Standards for Federal Offices of Inspector General*.
[74] *See* CIGIE, *Federal Reports*, https://www.oversight.gov/reports/federal  (last visited Dec. 16, 2025).

146.    POGO also relies on CIGIE's tracker of IG vacancies, which CIGIE launched in 2020 after Congress appropriated additional funds to improve oversight.gov[75] using data from POGO's own IG vacancy tracker, which POGO launched in 2012 and operated at significant cost.[76] When announcing the launch of its tracker, CIGIE publicly thanked POGO for POGO's tracker.[77] Because CIGIE assumed this responsibility, in 2020 POGO discontinued its tracker. Since then, POGO has relied on CIGIE's tracker to facilitate POGO's mission by alerting POGO and the public to vacancies and pressuring the administration and Congress to fill them with qualified candidates.

147.    By forcing CIGIE to shut down and stop operating these websites, Defendants thwarted POGO's ability to obtain much of the information above, restricted POGO's ability to carry out its mission-critical functions to improve and promote the functions of the IG community, and forced POGO to expend significant additional resources to find and disseminate what partial information remained available.

148.    For example, POGO was unable to access ignet.gov and oversight.gov when providing training on available resources for Congressional staff. As a result, POGO had to spend additional hours of staff time to find the CIGIE resources through alternate sites. Even then, only a portion of those resources were available.

149.    Similarly, without CIGIE's IG vacancy tracker, POGO received inquiries from interested parties looking for information about those vacancies. Because POGO had suspended

---

[75] *See* CIGIE, *Inspector General Vacancies*, https://www.oversight.gov/about/inspectors-general-vacancies  (last visited Dec. 16, 2025); *see also* Courtney Bublé, *IG Council Launches Online Tracker to Draw Attention to Vacancies*, Government Executive (Jan. 14, 2020), https://perma.cc/ZL7G-XBTY.
[76] *See* CIGIE, *Inspector General Vacancies*, https://www.oversight.gov/about/inspectors-general-vacancies  (last visited Dec. 16, 2025).
[77] Oversight.gov (@Oversightgov), X (Jan. 14, 2020, 3:04 PM), https://perma.cc/UT86-GX7H ("Thanks to @POGOBlog for its work since 2012 tracking Inspector General vacancies.").

tracking vacancies when CIGIE announced that it would do so, POGO could not assess or share vacancy information outside of that which was publicly reported in the media.

150.    The FOIA reading room also saves POGO much needed resources and time. When the reading room materials are not available, POGO must file additional FOIA requests and often litigate to obtain requested records, resulting in months or years of delay, or attempt to obtain the information from other sources. And POGO will again lose its ability to file FOIA requests to CIGIE—a necessity for records that are not in the reading room—altogether when CIGIE no longer has apportioned funding on January 31.

151.    Defendants' harm to POGO will only recur and compound until CIGIE's operations are fully funded. As it stands, on information and belief, Defendants' continued insistence on unlawfully providing only partial funding to CIGIE is causing CIGIE to curtail its operations, including the functions of the IC, on which POGO relies to investigate and report potential misconduct among OIGs.

152.    These harms will exponentially increase when CIGIE's temporary apportioned funding runs out. Not only will POGO lose its access to the extensive reports, data, standards, and guidance documents generated and housed by CIGIE on which POGO relies, but CIGIE's absence will, as described *supra*, negatively impact the effectiveness and integrity of the IG community, only further inhibiting POGO's efforts to assess and report on OIG conduct and craft and advocate for improvements to the system.

153.    In each of these scenarios, POGO has no choice but to dedicate significantly more resources to reporting and oversight of the IG community.

## CLAIMS FOR RELIEF

## COUNT ONE
## APA ARBITRARY AND CAPRICIOUS
## 5 U.S.C. § 706(2)(A)

154.    All preceding and subsequent paragraphs are incorporated herein by reference.

155.    The Administrative Procedure Act (APA) provides that a court "shall" "hold unlawful and set aside agency action" found to be "arbitrary" and "capricious." 5 U.S.C. § 706(2)(A).

156.    OMB maintained a long-time policy of apportioning CIGIE's yearly funding at the start of the fiscal year.

157.    Defendants have adopted a new policy to not apportion, or not fully apportion, CIGIE's funds for "policy" reasons: its unilateral determination that inspectors general are "corrupt." Defendants are acting pursuant to that policy, and are in fact not apportioning funds, contrary to prior OMB apportionment policy and the law.

158.    Defendants' policy constitutes final agency action reviewable under the APA.

159.    Defendants' policy is arbitrary and capricious because, among other things, Defendants have not provided a reasoned explanation for the new policy. Defendants have failed to "examine[] 'the relevant data' and articulate[] 'a satisfactory explanation' for [its] decision, 'including a rational connection between the facts found and the choice made.'" *Dep't of Com. v. N.Y.,* 588 U.S. 752, 773 (2019) (quoting *Motor Vehicle Mfrs. Assn. of the U.S., Inc. v. State Farm Mut. Auto. Inc. Co.*, 463 U.S. 29, 43 (1983)).

160.    Defendants' policy is also arbitrary and capricious because the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, and offered an explanation for its decision that runs counter to the evidence

34

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

161.    Defendants' policy is also arbitrary and capricious because the agency did not acknowledge that it was changing policies, *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and because Defendants entirely failed to consider the reliance interests of impacted stakeholders, including Plaintiffs. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dept. of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation and citations omitted).

## COUNT TWO
## APA CONTRARY TO LAW, CONTRARY TO CONSTITUTIONAL RIGHT, AND EXCEEDS STATUTORY AUTHORITY
## 5 U.S.C. § 706(2)(A)–(C)

162.    All preceding and subsequent paragraphs are incorporated herein by reference.

163.    The APA provides that a court "shall" "hold unlawful and set aside agency action" found to be "not in accordance with law[,]" "contrary to constitutional right, power, privilege, or immunity[,]" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(A)–(C).

164.    Defendants' policy and actions pursuant to that policy violated and continue to violate the Anti-Deficiency Act.

165.    Defendants violated the Anti-Deficiency Act by failing to apportion in writing CIGIE's appropriations by September 10, 2025. 31 U.S.C. §§ 1513(b)(1), (2)(A).

166.    Defendants violated the Anti-Deficiency Act by failing to apportion any funds for CIGIE until November 18, 2025. 31 U.S.C. §§ 1513(b)(1), (2)(A).

167.    Defendants violated the Anti-Deficiency Act by making apportionment decisions for no-year funds based on considerations other than "achiev[ing] the most effective and economical use" of the funds. 31 U.S.C. § 1512(a).

168.    Defendants violated the Anti-Deficiency Act by unlawfully establishing a reserve for policy reasons not permitted by the Act. *See* 31 U.S.C. § 1512(c)(1)(A)-(C).

169.    Defendants' policy and actions pursuant to that policy also violated and continue to violate the constitutional separation of powers by unlawfully preventing the obligation and expenditure of funds in derogation of Congress's power of the purse and without constitutional authority, and by seeking to eliminate CIGIE, an independent entity created by statute, unlawfully usurping Congress's authority to create and abolish offices.

## COUNT THREE
## APA UNLAWFULLY WITHHELD OR DELAYED ACTION
## 5 U.S.C. § 706(1)

170.    All preceding and subsequent paragraphs are incorporated herein by reference.

171.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

172.    Defendants have a mandatory duty to apportion funds to CIGIE "not later than . . . 20 days before the beginning of the fiscal year," which for fiscal year 2026 was September 10, 2025. 31 U.S.C. §§ 1513(b)(1), (2)(A). Because Defendants did not approve a fiscal year 2026 apportionment for the Inspectors General Council Fund until November 18, 2025, Defendants did not comply with this mandatory duty.

173.    Defendants have a mandatory duty to apportion funds to CIGIE so that CIGIE can continue operations and fulfill its statutory mandates. *See* 31 U.S.C. § 1513(b)(1). Defendants have not complied with this mandatory duty.

174.    Defendants have therefore violated section 706(1) of the APA by unlawfully withholding the apportionment of funds.

## COUNT FOUR
## SEPARATION OF POWERS

175.    All preceding and subsequent paragraphs are incorporated herein by reference.

176.    This Court has inherent equitable power to enjoin unconstitutional executive conduct. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

177.    The Constitution empowers Congress to make laws, U.S. Const. art. I, § 1, and requires the President to faithfully execute those laws, *id.* art. II, § 3. The President lacks the unilateral authority to modify or amend duly enacted legislation—the President may only "approve all the parts of a Bill, or reject it in toto." *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998) (citation omitted); *see* U.S. Const. art. I, § 7, cl. 2. The President cannot delegate powers to other executive branch officials that violate the Constitution.

178.    Congress's powers to set the policies of the nation are at their apex when it comes to spending money, as the Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const., art. I, § 8, cl. 1; *id.*, § 9, cl. 7.

179.    Exercising its constitutional authorities, Congress created CIGIE and provided a statutory scheme enabling no-year funding so that CIGIE can undertake its statutory duties. Defendants' refusal to comply with Congressional statutory mandates violates the constitutional separation of powers. *See In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

180.    By that same token, the executive branch cannot unilaterally shutter a Congressionally-created agency or, in the case of partial funding, prevent an agency from performing its statutorily required functions.

181.    Defendants' actions violate the separation of powers in infringing on Congress's legislative authority and power of the purse, in failing to faithfully execute laws passed by Congress, and in attempting to amend, modify, or partially veto duly enacted legislation.

### COUNT FIVE
### MANDAMUS ACT, 28 U.S.C. § 1361
### ALL WRITS ACT, 28 U.S.C. § 1651

182.    All preceding and subsequent paragraphs are incorporated herein by reference.

183.    The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

184.    The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

185.    Defendants have a mandatory duty to apportion funds based solely on the need to achieve the most effective and economical use of the appropriation. 31 U.S.C. § 1512(a).

186.    It is necessary and appropriate for this Court to issue a writ of mandamus pursuant to 28 U.S.C. §§ 1361 and 1651 and under this Court's equitable authority to compel Defendants to act.

### COUNT SIX
### ULTRA VIRES

187.    All preceding and subsequent paragraphs are incorporated herein by reference.

188.    An agency acts *ultra vires* when it "plainly acts in excess of its delegated powers." *Fresno Cmty. Hosp. & Med. Ctr. v. Cochran*, 987 F.3d 158, 162 (D.C. Cir. 2021).

189.    Judicial "[r]eview for *ultra vires* acts rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief." *Nat'l Ass'n of*

38

*Postal Supervisors v. U.S. Postal Serv.*, 26 F.4th 960, 970 (D.C. Cir. 2022) (internal quotations and citation omitted).

190.    This Court has inherent equitable power to enjoin *ultra vires* conduct by Defendants. No statute, constitutional provision, or other source of law authorizes Defendants to withhold CIGIE's funding or to reserve funding for policy reasons. To the contrary, the relevant statutes require Defendants to apportion available funds from CIGIE's no-year, revolving fund to make them available to CIGIE for use in performing its responsibilities.

191.    Defendants' actions are therefore *ultra vires*.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare unlawful and set aside Defendants' policy decision to not apportion, or not fully apportion, appropriated funds to CIGIE for fiscal year 2026 as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2)(A), contrary to constitutional right, power, privilege, or immunity under 5 U.S.C. § 706(2)(B), and in excess of statutory jurisdiction, authority, or limitations, or short of statutory right under 5 U.S.C. § 706(2)(C);

B.    Declare unlawful and set aside Defendants' withholding or unreasonable delays of performing their mandatory duties to timely apportion funds to CIGIE;

C.    Issue preliminary and permanent relief, including but not limited to mandamus and injunctive relief, ordering Defendants: (1) to cease carrying out their unlawful policies and actions, and to cease withholding or unreasonably delaying the apportionment of CIGIE's funds; and (2) to immediately apportion appropriated funds to CIGIE without regard to Defendants' new policy to not apportion, or not fully apportion, these funds and without regard to any policy reviews or processes that are ongoing;

D.    Award Plaintiffs reasonable costs and attorneys' fees; and

E.    Grant any other relief that the Court deems fit and proper.

December 17, 2025                         Respectfully submitted,

*/s/ Kali Schellenberg*
Kali Schellenberg (Bar No. 31582)
Amy C. Vickery (NY Bar No. 5942271)[+]
Webb Lyons (D.C. Bar No. 103548)*[+]
Steven Y. Bressler (Bar No. 31881)
Elena Goldstein (Bar No. 31738)
Skye Perryman (D.C. Bar No. 984573)[+]
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
kschellenberg@democracyforward.org
avickery@democracyforward.org
wlyons@c.democracyforward.org*
sbressler@democracyforward.org
egoldstein@democracyforward.org
sperryman@democracyforward.org

*/s/ Nikhel S. Sus*
Nikhel S. Sus (Bar No. 31090)
Jonathan E. Maier (D.C. Bar No. 1013857)[+]
Christina L. Wentworth (D.C. Bar No. 1741468)[+]
Alex M. Goldstein (D.C. Bar No. 90005086)[+]
Citizens for Responsibility and Ethics in
Washington
P.O. Box 14596
Washington, D.C. 20004
(202) 408-5565
nsus@citizensforethics.org
jmaier@citizensforethics.org
cwentworth@citizensforethics.org
agoldstein@citizensforethics.org

*Counsel for All Plaintiffs*

[+] Pro hac vice forthcoming
* *Of Counsel*